Filed 7/30/26  N.S. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| N.S., | |
| Petitioner, | E088450 |
| v. | (Super.Ct.No. J302430) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | OPINION |
| Respondent; | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Steven A. Mapes, Judge.  Petition denied.

Matthew J. McDonald for Petitioner.

No appearance for Respondent.

Laura Feingold, County Counsel, Svetlana Kauper, Deputy County Counsel, for Real Party in Interest.

1

Nicole S. (Mother) petitions for extraordinary writ review of an order setting a hearing under Welfare and Institutions Code section 366.26 (unlabeled statutory citations refer to this code). (See Cal. Rules of Court, rule 8.452.) She challenges the juvenile court's finding that San Bernardino County Children and Family Services (CFS) provided reasonable reunification services. We conclude that Mother's arguments lack merit, and we accordingly deny the petition.

BACKGROUND

I.    *Referral and detention*

On October 8, 2024, CFS received an immediate response referral alleging general neglect and physical abuse of Mother's five-year-old son, Nathan. Mother had received a message from Nathan's afterschool program informing her that he had been complaining about his ear and "holding it all day." Mother brought Nathan to urgent care, where a doctor recommended that Nathan go to the emergency room because it was possible that he had an ear infection, pneumonia, or bronchitis. Examination at the emergency room revealed that his left cheek and the inside of his left ear were bruised. Mother told CFS that Nathan may have "hit himself against the wall or that their pet dog might have caused [his] injuries." Forensic pediatrician Dr. Carly Barruga opined that his injuries were "highly suspicious for physical abuse."

A hospital social worker reported that when Mother and Nathan were at the hospital, staff saw Mother's boyfriend, E.P., "[control] the direction of the conversation and not [allow Mother] to speak." E.P. "became aggressive and confrontational to the

2

point where local law enforcement escorted [him] out of the hospital." The social worker was concerned about domestic violence.

The following day, CFS tried to interview Nathan but could not "due in part to his developmental delay." Mother explained that Nathan "is non-verbal." According to Nathan's medical history, he was born with mild cognitive delays and mild fine-motor delays and was "delayed on the language and gross motor domains."

Resident physician Dr. Tiffany Nguyen told CFS that Nathan had "isolated bruising to his left check and inner left ear." She explained that the injuries in those locations were not typically seen in children his age. She opined that the mechanisms provided by Mother were not consistent with his injuries, and she suspected child abuse.

CFS obtained a warrant, took Nathan into protective custody, and filed a petition under section 300, alleging that Nathan sustained nonaccidental injuries while in Mother's care and that he had been exposed to domestic violence.

The court held a detention hearing on October 14, 2024, while Nathan was still in the hospital. At Mother's counsel's request, the court ordered predisposition services. The court also ordered that E.P. have no direct or indirect visitation with Nathan. The court detained Nathan and ordered that CFS find an appropriate placement for him upon his discharge from the hospital.

II.      *Jurisdiction and disposition*

When interviewed for the jurisdiction/disposition report, Mother denied the nonaccidental trauma allegation. She said that when she took Nathan to school on October 8, he did not have a bruise, but he returned home with one. Mother told the

3

social worker that their dog "could have knocked him over." She also said that Nathan could have caused the bruise because he was "'tugging on [his ear] all day.'"

Mother denied that there was any domestic violence. She said that the "'main reason they took [E.P.] out [of the hospital] was because he started getting mad and he started going off on the social worker saying "I feel like you stabbed me in the back."'" When CFS asked about Nathan's father, Mother said that she had a previous child welfare case in Monterey County, and Nathan's father physically abused him. Mother said that she was afraid that Nathan would be taken from her, so she did not report the father's abuse and left instead.

When CFS interviewed E.P., he said that Nathan could have "'wacked himself on his head'" or their dog "'could have knocked him over.'" E.P. denied that Nathan's injury was caused by nonaccidental trauma, because they "'noticed it after school,'" and they "'would have noticed the bruise that morning.'"

E.P. admitted that he had become agitated at the hospital, and he and Mother "felt that the doctors/nurses did not want them to be near [Nathan]." E.P. believed that Mother was "'not good at answering professional questions,'" and "'as the father figure [he] wanted to answer the questions.'" He explained that he became agitated because hospital staff "'presented the case wrong.'" He denied that he was "'escorted out of the hospital,'" and he said that he "'left the hospital voluntarily.'" E.P. denied that there was domestic violence in his relationship with Mother, and he said that he did not scream at or abuse Mother or Nathan.

4

CFS interviewed staff at Nathan's former school. One staff member said that Nathan "would cry hysterically every day and say 'no, no, no' when he knew he was getting picked up" by E.P. The staff member did not recall seeing a bruise on Nathan on October 8, 2024. She said that "several weeks ago," a health aide tried to wash Nathan's hands but was unable because his arm was "'tender to the touch.'" Nathan was "limited in speech," so he could not explain further.

Another staff member reported that Nathan "appeared 'fearful'" of E.P. She said that Nathan "appeared more comfortable around [M]other but still seemed 'fearful' of her."

A staff member from Nathan's afterschool program reported that she worked with Nathan "very closely" and said that he was "a pleasant child." She said that she saw the bruise on October 7 and 8, 2024. She also said that Nathan pulled on his ear, cried, and leaned on the staff. She said that Nathan "would always cry when he knew he was getting picked up," and E.P "always" picked him up. She said that most children want to go home, "'but Nathan didn't and that was weird.'"

Another staff member from Nathan's afterschool program reported that Nathan had a bruise on his cheek and a red ear "for two days in a row." She did not know Nathan to be "'clumsy'" or to "'fall on purpose,'" and she said that "he does not self-harm in any way." She noticed that Nathan appeared to be fearful of E.P. and would "'refuse'" to go home with E.P. She saw E.P. grab Nathan, and Nathan would say, "'no, no.'" Another staff member reported that she noticed red marks on Nathan's neck on October 4, 2024. She took a photograph of the bruising and injury inside Nathan's ear on October 7, 2024.

5

The nurse practitioner in the pediatric emergency department noted that the family "ha[d] different versions" of how Nathan's cheek became bruised. Nathan was diagnosed with an upper respiratory infection, facial bruising, an abrasion of the left ear, and nonaccidental traumatic injury. His discharge summary noted that he was "[s]evere[ly] maln[ourished]," but that condition was improving.

In January 2025, CFS filed an "additional information to the court," reporting that Mother participated in predisposition services. She provided five negative drug tests and was a "'[n]o [s]how'" for one test. CFS reported that Mother had been referred to parenting education, individual counseling, domestic violence classes, and random drug testing. Mother had completed six out of eight individual counseling sessions and six out of 12 domestic violence classes, and she had started parenting education classes. Mother was consistently visiting Nathan.

At the contested jurisdiction and disposition hearings in February 2025, the court sustained the petition in part but dismissed the domestic violence allegation. The court adjudged Nathan a dependent, removed him from Mother's care, and ordered reunification services for Mother. Mother objected to her case plan's requirement that she complete a substance abuse program with random drug testing. The court struck the outpatient program requirement "'absent new manifesting need as part of reasonable service to remove risk and reunification,'" but the dispositional order also provided for on-demand drug testing based on probable cause. Mother did not appeal.

6

III. *Six-month review hearing*

In its report for the six-month status review hearing, CFS reported that in February 2025, Mother married E.P. Mother was living with E.P., his mother, and his mother's husband. Mother had told the social worker that she had "'no where to go,'" and she could not leave E.P.'s family's home. She did not have a driver's license, and E.P. was her primary source of transportation to her visits with Nathan.

CFS reported that in November 2024, E.P. took pictures of Nathan's caregiver's vehicle and license plates. The following week, CFS observed E.P. "'yelling'" at Mother about Nathan needing a sweater.

Mother told CFS that E.P.'s mother was part of her support system and was willing to watch Nathan while Mother was working. Mother did not "feel [that] the maternal family members [were] appropriate to care for" Nathan. She said that Nathan came "'first' in her life and if she were able to leave [E.P.] she would."

In July 2025, CFS interviewed Mother over the telephone, and the social worker could hear a man "prompting [Mother] what to ask and what to say." The social worker asked the man to allow Mother to speak with her privately. Mother then told CFS that E.P. had left the room and was outside.

CFS reported that Mother was referred to individual therapy, and the therapist requested a renewal. The therapist was concerned about Mother's ability to protect Nathan. During therapy, Mother denied that she or E.P. hit Nathan. She said that it was "more likely that [Nathan] fell down or hit himself," but she did not know how it happened. The therapist also reported that Mother's extended family claimed that E.P.

7

had committed domestic violence by being "controlling and manipulative," which Mother believed to be untrue. Mother "cut off her family" because she believed that they were "extremely dysfunctional, unhealthy, manipulative of her, lie[d] about her, spread lies about [E.P.], and [were] negative and abusive in their treatment of her." The therapist believed that Mother was "prioritizing the relationship [with E.P.] rather than her child." As a result, Nathan would continue "to be exposed to the adult issues, neglected and remain at risk of potential abuse." The therapist was "not convinced that [Mother was] willing to provide a significantly higher level of monitoring over [Nathan] to ensure his protection nor [was Mother] willing to compromise her adult relationship as it provides her the freedom and independence from her family."

The therapist reported that Mother exposed Nathan to three different men in four years, and Nathan "ha[d] been the recipient of either physical and/or emotional abuse from each one." The therapist had not seen Mother model a healthy relationship for Nathan. The therapist opined that perhaps Mother "having a different therapist in the future would provide a more positive perspective and be able to identify her capacity to ensure [Nathan's] safety more clearly."

Mother completed her parenting classes, and CFS received a completed progress report. According to the report, Mother learned "the full extent and responsibility of protective capacity and how failure to protect will impact the children developmentally, emotionally, physically, and psychologically."

In July 2025, Mother told CFS that she felt responsible for E.P.'s "escalated behavior" at the hospital. CFS was concerned that Mother needed additional individual

therapy, "as it appear[ed] [Mother] did not benefit from services." Mother said that "she takes full accountability for not supervising [Nathan] correctly but still denies physical abuse to the child, Nathan." Mother's case plan required general counseling to address safe parenting practices and protective actions; counseling was to "continue until such time as the assigned social worker determine[d] in consultation with the therapist that the goals of therapy ha[d] been met and therapy [was] no longer necessary." In July 2025, CFS referred Mother to more individual therapy. The referral included counseling from August 2025 to December 2025.

In August 2025, at the six-month review hearing, Mother's counsel told the court that Mother was "leaving [E.P.] and separating from him at this time." The court continued Mother's reunification services and found by clear and convincing evidence that reasonable services had been provided. Mother did not appeal.

IV.     *Twelve-month review hearing*

In its 12-month status review report, CFS recommended that Mother's reunification services be terminated. CFS believed that Mother "lacks accountability and has failed to demonstrate that she has benefitted from the services that the court ordered." In August 2025, after Mother told CFS that she had left E.P. and moved out of his home, the caregiver saw E.P. drop her off and pick her up from her visits with Nathan. In October 2025, Mother revealed that she had moved back in with E.P. Mother admitted that she had left E.P. because "[e]veryone was telling [her] to leave him. [Her] friends, [her] family … so [she] did." She told the social worker that E.P. "'is like a father figure to Nathan,'" and she said that she "'kn[e]w he didn't hit him.'" Mother thought that

9

"'[t]here wasn't really proof of physical abuse.'" Mother had gained full-time employment as a cook at a casino, and she had good benefits. She regularly visited Nathan, but the caregivers reported that at visits she did not interact much with him. Nathan and Mother "played on their phones, across the room, and away from each other." When the caregivers asked Nathan if he wanted to see his Mother, Nathan "always sa[id] 'no.'" Mother asked that Nathan be placed with the maternal grandparents.

Mother's second individual therapist reported that Mother had attended six sessions. Mother had made "some progress on identified goals and has now learned and applied techniques to better manage [her] agitation and passiveness."

CFS thought that Mother's prognosis for reunification with Nathan was "very poor." CFS reported that Mother "did not accept responsibility for her actions and after one year of reunification services, and being separated from the child, she continue[d] to discount the allegations [and] provid[ed] scenarios where she remove[d] all responsibility for the injuries caused upon Nathan." Mother insisted that E.P. was good for Nathan and that Nathan should visit with E.P. CFS reported that Mother showed a "lack of protective capacity."

In December 2025, CFS filed an "additional information to the court," again recommending that the court terminate Mother's reunification services and set a hearing pursuant to section 366.26. CFS reported that Mother had requested that Nathan be placed with the maternal grandparents, but CFS found that they had an extensive criminal history and did not have a relationship with Nathan.

In January 2026, CFS filed another "additional information to the court." Mother had told CFS that she and E.P. were receiving therapy through Kaiser. Mother also told CFS that she and the maternal grandfather "'parted ways,'" and she preferred that Nathan stay with his current caregivers. Mother continued to insist that E.P. did not cause Nathan's injuries, and she suggested that his injuries were the result of "[his] chromosome" and being "very active."

In April 2026, CFS received law enforcement service call reports describing a welfare check for Mother "due to husband being abusive." When law enforcement arrived at the home, E.P. and Mother were not there.

CFS held a child and family team meeting to assess whether Nathan could be safely returned to Mother. Mother and E.P. participated in the meeting, and Mother said that Nathan's bruising "wasn't physical abuse." Mother knew "for a fact that [Nathan's injuries] happened at school." E.P. said that "[s]chool staff didn't understand [Nathan]; they said he didn't want to leave the school because he was scared of me, but it was because he was enjoying school, not because he was scared of me." E.P. said that the court "hates" him and that CFS's report was not true.

CFS thought that Mother and E.P. were not taking responsibility for the circumstances that led to Nathan's removal. CFS believed that "Nathan's developmental delays [made] him even more vulnerable" because he was not "able to disclose abuse." CFS recommended that the court terminate Mother's reunification services, set a section 366.26 hearing, and maintain "the no-contact order between [E.P.] and Nathan."

11

At the contested 12-month review hearing in May 2026, Mother testified that she had participated in individual therapy, parenting classes, and domestic violence classes. She learned about the seven different types of domestic violence. Mother testified that she left E.P. "for about a few days" because she was "being pressured" by her family and friends. She started living with E.P. again because "there was nothing wrong with it."

Mother agreed that Nathan had a bruise, but she denied that she or E.P. caused it. Mother admitted that her family did not like E.P., because they thought that he was controlling. Mother acknowledged that she had participated in a domestic violence class "at the beginning," and she completed it in March 2025.

E.P. testified that he had been in a relationship with Mother for two years, and they had been married for one year. He did not know that the court had found his contact with Nathan detrimental. E.P. took parenting classes, domestic violence courses, and anger management. He acknowledged that when the police were called to his mother's home, there had been a request for a welfare check on Mother. He claimed that when Nathan did not want to go with him when he picked Nathan up from school, the reason was that Nathan "wanted more time with the children his age."

The court found that CFS had provided reasonable services. The court also found that returning Nathan to Mother's care would create a substantial risk of detriment to his safety, protection, or wellbeing. The court found that Mother had failed to make substantive progress in her court-ordered case plan, and there was not a substantial probability that Nathan would be returned within the statutory timeframes. The court terminated reunification services and set a hearing under section 366.26.

12

DISCUSSION

Mother argues that the court erred by finding that CFS had provided her with reasonable reunification services. Her arguments lack merit.

At the 12-month review hearing, the court must "determine by clear and convincing evidence" whether reasonable services were provided. (§ 366.21, subd. (f)(1)(A).) The court must continue reunification services to the 18-month review hearing if reasonable services have not been provided. (§§ 361.5, subd. (a)(3)(A); 366.21, subd. (g)(1).)

"In almost all cases it will be true that more services could have been provided more frequently and that the services provided were imperfect. The standard is not whether the services provided were the best that might be provided in an ideal world, but whether the services were reasonable under the circumstances." (*In re Misako R.* (1991) 2 Cal.App.4th 538, 547.) We review the juvenile court's findings for substantial evidence. (*In re A.O.* (2025) 111 Cal.App.5th 1048, 1061-1062.)

First, Mother argues that CFS did not provide reasonable reunification services, because CFS "did not refer [her] to domestic violence services at any point during the entirety of the reunification period." Mother's argument lacks merit for several reasons.

At the six-month review hearing, the juvenile court found by clear and convincing evidence that reasonable services had been provided, and Mother did not appeal. She cannot now challenge the court's findings from that review hearing. (*In re Julie M.* (1999) 69 Cal.App.4th 41, 47.) Consequently, the issue before us is whether the juvenile court's subsequent finding that CFS provided reasonable services between the six-month

13

review and the 12-month review is supported by substantial evidence. (*In re Cicely L.* (1994) 28 Cal.App.4th 1697, 1705-1706.)

Mother's case plan following the six-month review hearing did not include a domestic violence program. If Mother believed that the case plan was deficient because it did not call for domestic violence services, then she could have appealed from the findings and orders at the six-month review. She did not. Because Mother's court-ordered case plan did not call for her to participate in a domestic violence program, it was not unreasonable for CFS to fail to refer her to such a program. Indeed, if CFS had referred her to such a program, Mother could have legitimately complained that CFS was improperly requiring her to do things that went beyond her case plan requirements.

Moreover, at the six-month review hearing, Mother's counsel told the court that Mother was "leaving [E.P.] and separating from him at this time." It was therefore reasonable for CFS to recommend and for the court to order a case plan that did not include domestic violence services, particularly given that the petition's domestic violence allegation had been dismissed at Mother's request.

Second, Mother argues with respect to individual counseling that despite "skepticism about [CFS's] own contracted treatment provider, from October 2025 through May 2026, [CFS] did not make a single additional[] referral to any counseling service, leaving Mother to believe she had successfully completed that component of her case plan." Mother's argument fails to show that CFS did not provide reasonable services. CFS referred Mother to individual counseling twice but concluded that, although Mother completed counseling both times, she did not make sufficient progress

14

toward alleviating the causes that led to Nathan's removal. The therapists' reports supported that conclusion. Her first therapist believed that Mother was "prioritizing the relationship [with E.P.] rather than her child," and the therapist was "not convinced that [Mother was] willing to provide a significantly higher level of monitoring over [Nathan] to ensure his protection nor [was Mother] willing to compromise her adult relationship as it provides her the freedom and independence from her family." Her second therapist believed that Mother had made some progress but "ha[d] not learned and applied techniques to better manage [her] agitation and passiveness." Mother's own conduct and statements further confirmed CFS's assessment: In October 2025, Mother told CFS that she had moved back in with E.P., insisted that E.P. and Nathan visit, and expressed her desire to "prove" that E.P. was "not a bad person as everyone depicted." Mother's failure to make substantive progress in therapy does not show that there was something wrong with the therapists or that CFS's services were not reasonable.

Third, Mother argues that CFS failed to provide her with reasonable reunification services because it did not offer her any housing assistance. She contends that CFS should have known that housing was an issue because she told CFS that "'she had nowhere to go.'" Mother's argument fails because, as with the domestic violence program, her court-ordered case plan did not call for CFS to provide her with housing assistance. The court never ordered any housing services, because Mother never had an issue with housing and never asked for housing services. If Mother believed that her case plan was deficient because it did not require CFS to provide her with housing assistance, she could have appealed from the findings and orders at the six-month review. She did

15

not. Moreover, even though Mother told CFS in August 2025 that she did not have anywhere to go, Mother's counsel subsequently told the court that Mother was leaving E.P., and counsel never said that Mother needed any help finding a place to live. Mother subsequently returned to E.P., later explaining that "there was nothing wrong with" their relationship and that she had left only because she was pressured by her family and friends. In addition, around the time that Mother moved back in with E.P., she obtained a full-time job with "good benefits." For all of these reasons, it was reasonable for CFS to conclude that Mother was living with E.P. by choice rather than out of necessity, she was not in need of housing assistance, and providing her with housing assistance (which was not required by her case plan) would have been pointless.

Finally, Mother argues that CFS failed to engage sufficiently with E.P. and Mother's ongoing relationship with him. It is not clear what additional services Mother claims should have been provided, but the argument lacks merit in any event. E.P. is a stepparent and is therefore not entitled to reunification services (*In re Jodi B.* (1991) 227 Cal.App.3d 1322, 1329), and the court did not order services for him. Mother's court-ordered case plan did not require CFS to provide any services to E.P. Again, Mother could have challenged any deficiencies in the case plan by appealing from the findings and orders at the six-month review, but she did not. And it was reasonable for the case plan at the six-month review to omit such services, because Mother (through counsel) represented to the court that she was separating from E.P. CFS's failure to engage in some unspecified manner with a nonparty in order to provide services not required by

16

Mother's court-ordered case plan does not show that CFS failed to provide Mother with reasonable reunification services.

DISPOSITION

The petition is denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

MENETREZ  
                   J.

We concur:

CODRINGTON  
       Acting P. J.

LEE  
          J.